## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO.** ~~2:26-CR-54~~ |
| | **JUDGE** |
| v. | **INDICTMENT** |
| **SAMUEL APPIAH** | **18 U.S.C. § 1956(h)** |
| | **FORFEITURE ALLEGATION** |

**THE GRAND JURY CHARGES:**

All dates and times in this Indictment are alleged to be "on or about," "in and around," or "through and including" the specific dates stated.

### Background

At all times relevant to this Indictment:

1.      Defendant **SAMUEL APPIAH ("APPIAH")** was a resident of the Southern District of Ohio.

2.      In February 2019, **APPIAH** established and caused to be established a business called Fabgold/Auto LLC by filing paperwork with the Ohio Secretary of State.

3.      In March 2019, **APPIAH** established and caused to be established a business called Prestige Transit LLC by filing paperwork with the Ohio Secretary of State.

### COUNT 1
### Conspiracy to Commit Money Laundering

4.      Paragraphs 1 through 3 are incorporated here.

5.      From at least February 2019 through at least June 2022, Defendant **SAMUEL APPIAH ("APPIAH")** knowingly combined, conspired, and agreed with other persons known

and unknown to the Grand Jury to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957—namely:

      a.     to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity—namely, wire fraud—knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

      b.     to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity—namely, wire fraud—in violation of 18 U.S.C. § 1957.

6.     The object of the conspiracy was to launder the proceeds of online romance-fraud schemes and a business email compromise scheme.

<strong>Manner and Means of the Conspiracy</strong>

7.     It was part of the conspiracy that **APPIAH** and other members of the conspiracy laundered the proceeds of online romance scams. The perpetrators of the romance scams created several profiles on online dating sites and online social media sites. The scammers then contacted men and women throughout the United States and elsewhere, with whom they cultivated a sense of affection and, often, romance. Having established relationships with the victims, the perpetrators of the romance scams ultimately requested money, ordinarily for

2

investment reasons or need-based reasons. The perpetrators provided account information and directed where the money should be sent. In part, these accounts were controlled by **APPIAH**. The funds were not used for the purposes claimed by the perpetrators of the romance scams.

8. It was further part of the conspiracy that **APPIAH** and other members of the conspiracy laundered the proceeds of a business email compromise ("BEC") scheme. In general, a BEC scheme is a fraud scheme targeting businesses or other entities that engage in electronic payments, such as wire transfers or ACH payments. Commonly, the goal of a BEC scheme is to deceive an employee at the victim entity into sending an electronic payment to a bank account in the control of the schemers instead of the legitimate recipient. A victim of a BEC scheme was deceived into sending money to an account in the control of a member of the money-laundering conspiracy. That coconspirator sent at least $140,000 in BEC fraud proceeds to **APPIAH**, who conducted further money-laundering transactions involving the BEC fraud proceeds.

9. It was further part of the conspiracy that **APPIAH** established and used companies for the purpose of laundering criminal proceeds, including Fabgold/Auto LLC and Prestige Transit, LLC.

10. It was further part of the conspiracy that **APPIAH** opened and used bank accounts in his control to launder criminal proceeds. The accounts included a Bank of America account with an account number ending in x7293 ("BOA x7293"), a Fifth Third Bank account with an account number ending in x2972 ("FTB x2972"), a Huntington Bank account with an account number ending in x4078 ("HNB x4078"), a Huntington Bank account with an account number ending in x4078 ("HNB x1920"), a Kemba Financial Credit Union account with account number ending x9658-80 ("Kemba 9658-80"), a Key Bank account with account number ending x9230 ("Key x9230"), a Lending Club account with account number ending x7179 ("Lending

3

Club x7179"), a PNC Bank account with account number ending x6986 ("PNC x6986"), a Telhio Credit Union account with account number ending in x5408 ("Telhio x5408"), a US Bank account with account number ending x1883 ("USB x1883"), and a WesBanco account with account number ending x0120 ("WesBanco x0120").

11. It was further part of the conspiracy that **APPIAH** received proceeds from romance scams and BEC fraud into the above-described bank accounts.

12. It was further part of the conspiracy that **APPIAH** conducted financial transactions which were designed, in whole and in part, to conceal the nature, location, source, ownership, and control of the fraud proceeds.

13. It was further part of the conspiracy that **APPIAH** conducted monetary transactions involving fraud proceeds of a value greater than $10,000.

14. It was further part of the conspiracy that Defendant **APPIAH** received a percentage of the funds he laundered as payment for his money laundering activities. During the period of the conspiracy, **APPIAH** conducted several cash withdrawals involving criminal proceeds. **APPIAH** also used criminal proceeds to conduct purchases at Mercedes Benz of Easton, Mitchell's Steakhouse, Mitchell's Ocean Club, M at Miranova, Hyde Park, J Alexander's, Cooper's Hawk, Cheesecake Factory Polaris, Von Maur, Gucci, Saks Fifth Avenue, Hermes, Louis Vuitton, Christian Louboutin, and many other businesses.

**In violation of 18 U.S.C. § 1956(h).**

## FORFEITURE ALLEGATION

15.     Paragraphs 1 through 14 are incorporated here.

16.     Upon conviction of the violation of 18 U.S.C. § 1956(h) charged in Count 1 of this Indictment, Defendant **SAMUEL APPIAH ("APPIAH")** shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such violations as alleged, or any property traceable to such property.

17.     If any of the above-described forfeitable property, as a result of any act or omission of **APPIAH**, cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of **APPIAH** up to the value of the forfeitable property described above.

**Forfeiture in accordance with 18 U.S.C. § 982(a)(1) and Rule 32.2 of the Federal Rules of Criminal Procedure.**

**A TRUE BILL**

s/Foreperson
**FOREPERSON**

**DOMINICK S. GERACE II**
**United States Attorney**

**PETER K. GLENN-APPLEGATE (0088708)**
**Assistant United States Attorney**

5